**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| **GILBERTON COAL COMPANY,** | : | |
| **Appellant** | : | **CIVIL NO. 4:10-CV-01947** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **SPLIT VEIN COAL COMPANY,** | : | |
| **Appellee/** | : | |
| **Debtor in Possession** | : | |

**MEMORANDUM**

Before the Court is an appeal filed September 17, 2010, by Defendant-Appellant

Gilberton Coal Company ("Gilberton") pursuant to 28 U.S.C. § 158(a). Gilberton filed a

supporting brief on October 1, 2010. (Doc. No. 7.) Plaintiff-Appellee Split Vein Coal Company

("Split Vein") filed a brief in opposition on October 25, 2010. (Doc. No. 10.) Gilberton filed a

reply brief on November 5, 2010. (Doc. No. 11.) For the reasons that follow, the Court will

affirm the decision of the Bankruptcy Court.

## I.      STANDARD OF REVIEW

A district court sits as a court of appeals reviewing a final order of the Bankruptcy Court

under 28 U.S.C. § 158(a)(1). See also Fed. R. Bankr. P. 8001(a). Under Federal Rule of

Bankruptcy Procedure 8013, the district court may affirm, modify, or reverse the decision of the

Bankruptcy Court, or may remand with instructions for further proceedings. The district court

reviews the Bankruptcy Court's legal determinations de novo, its factual findings for clear error,

and its exercise of discretion for abuse thereof. In re O'Brien Envtl Energy, Inc., 188 F.3d 116,

122 (3d Cir. 1999). When an issue is a mixed question of law and fact, the issue is broken down

into its component parts and the appropriate standard is applied to each component. In re

1

Fegley, 118 F.3d 979, 982 (3d Cir. 1997).  As such, the Court "accept[s] the trial court's findings

of historical or narrative facts unless they are clearly erroneous, but we must exercise a plenary

review of the trial court's choice and interpretation of legal precepts and its application of those

precepts to the historical facts."  Universal Minerals, Inc. v. C. A. Hughes & Co., 669 F.2d 98,

103 (3d Cir. 1981) (footnote citation omitted).

## II.    PROCEDURAL BACKGROUND

On January 1, 2007, Split Vein filed a complaint against Gilberton and Seedco NP, LLC

("Seedco").  (Doc. No. 2, Ex. 1.)  Split Vein filed an amended complaint on May 10, 2007, and

Seedco was dismissed from the case on February 12, 2009.  (Doc. No. 2, Ex. 2.)  Split Vein

alleged that it deposited approximately 600,000 tons of residual coal waste on properties owned

by Gilberton and Seedco, and that Gilberton improperly removed and converted this waste, also

referred to as culm, which was actually owned by Split Vein.  After Split Vein filed its amended

complaint, Gilberton filed its answer and counterclaim with the Bankruptcy Court on February 9,

2007.  (Doc. No. 2, Ex. 6.)  Gilberton filed a motion for partial summary judgment on August 6,

2007, seeking partial summary judgment on the issue of who legally owned the culm and Split

Vein's requests that it be compensated for the culm removed.  Chief Bankruptcy Judge Mary

France denied the motion by a memorandum and order dated December 7, 2007.

Judge France held a two-day trial in this action on February 11 and 12, 2009.  After post-

trial briefing by the parties, the Bankruptcy Court issued an order resolving the case on

December 11, 2009.  In the order, Judge France concluded that (1) Split Vein had met its burden

in proving that Gilberton had converted the culm, (2) the culm in fact was not abandoned by

Split Vein, (3) the agreement that had been reached between Split Vein and Gilberton in 1991

2

("the Agreement") had not been abandoned by Split Vein, (4) the Agreement was not rejected by law pursuant to 11 U.S.C. § 365(d)(4), and (5) Gilberton was not protected by the defense of privilege concerning its conversion of the culm.  (Doc. No. 2, Ex. 12.)[1]

Gilberton filed a motion for reconsideration on December 12, 2009.  (Doc. No. 2, Ex. 11.)  On January 5, 2010, Gilberton filed a brief in support.  (Doc. No. 2, Ex. 9.)  Split Vein filed its brief in opposition to the motion for reconsideration on January 19, 2010.  (Doc. No. 2, Ex. 8.)  Judge France issued an order on August 11, 2010 denying Gilberton's motion for reconsideration.  (Doc. No. 2, Ex. 14.)  Gilberton filed a notice of the instant appeal from the decision of the Bankruptcy Court on September 17, 2010.  (Doc. No. 1.)

## III.    FACTUAL BACKGROUND

The factual findings contained in Judge France's thorough memorandum and order dated December 11, 2009, are as follows.[2]  Split Vein is a Pennsylvania corporation whose sole shareholder and president is Elwood Swank.[3]  Split Vein's principal place of business is in Northumberland County, Pennsylvania.  Gilberton[4] is also a Pennsylvania corporation and is

---

[1] Judge France also denied Gilberton's counterclaim filed against Split Vein and Split Vein's claim for "wheelage."  (Doc. No. 2, Ex. 12.)

[2] As noted above, this Court reviews the Bankruptcy Court's factual findings for clear error.  See In re O'Brien, 188 F.3d at 122; see also In re Nelson Co., 959 F.2d 1260, 1263 (3d Cir. 1992).  Upon a review of the record in this case, the Court concludes that Judge France committed no clear factual errors.  Therefore, the following factual recitation is drawn from Judge France's thorough synopsis, which is found in Split Vein Coal Co. v. Gilberton Coal Co., Doc. No. 1:03-bk-02974, 2009 WL 4937760 (Bankr. M.D. Pa. 2009).  See also (Doc. No. 2, Ex. 12.)

[3] According to Judge France, Split Vein's "business activities included the recovery, reprocessing and sale of coal refuse recovered from lands leased for this purpose.  In order to process the coal refuse, [Split Vein] operated two processing plants known as the Henry Clay and Paxinos breakers."  (Doc. No. 2, Ex. 12 at 2.)

[4] "Gilberton is primarily engaged in owning and leasing real property containing anthracite coal and/or coal refuse banks.  Generally, it is Gilberton's business practice to enter into license agreements

owned and operated by the relatives of John Rich.

A.     **The Agreement Between Gilberton and Split Vein**

Gilberton and Split Vein entered into an agreement ("Agreement") on or about September 12, 1991.  According to the Agreement, Split Vein received "a license and easement" to remove culm[5] that was located on an area of land owned by Gilberton and referred to as the Excelsior Bank.  In paragraph 22 of the Agreement, the Agreement is referred to not as a license or easement, but instead as a lease.

---

with parties for the removal of material for which the licensee pays Gilberton a royalty based upon the tonnage of material removed."  (Id.)

[5] As noted by Judge France:

> [Culm] is waste material from coal mining operations. Between the early 1800s and late 1970s, mining companies discarded coal refuse by dumping it on vacant land where it accumulated in large piles or banks. Culm consists of coal, rock, shale and other non-combustible materials. See 52 P.S. § 30.53. It has a low BTU value, and until new technology was introduced in the 1980s, culm had no commercial value. It is estimated that by the late 1970s, when laws were enacted requiring the reclamation of mined sites, approximately 2.4 billion tons of culm had been abandoned throughout Pennsylvania's coal region.
>
> Before culm can be burned effectively, it must be processed by running it through a breaker. The resulting material is separated into different categories based upon the size of the material. The breaking process is not a precise one; coal often remains attached to or mixed with non-combustible materials after the process is completed. Even after this processing, waste is created, which is redeposited on the property's surface. All phases of coal refuse processing, including the redepositing of culm, are subject to federal and state environmental statutes and regulations. In Pennsylvania, a business engaged in coal refuse recovery must obtain a surface mining permit ("SMP") from the Pennsylvania Department of Environmental Protection ("DEP") prior to commencing surface operations. Upon completion of its work on a culm bank, a mining company is required by law to commence reclamation activities, including erosion control and revegetation. See 28 Pa. Code § 88.1 et. seq. (2009).
>
> (Doc. No. 2, Ex. 12 at 2-3) (footnote citation omitted).

At a minimum, the terms of the Agreement and the oral modifications agreed to by the parties included the following:

> (1) After an initial term of one (1) year, the Agreement was to run on a month-to-month basis;
>
> (2) Split Vein was entitled to remove culm that was a size of three inches or smaller;
>
> (3) In light of its right to recover this culm from the Excelsior Bank, Split Vein was required to make a royalty payment of $3.50 for each ton of culm removed;[6] and
>
> (4) At a minimum, Split Vein was required to make royalty payments to Gilberton in the amount of $1,000 each month;

(Doc. No. 2, Ex. 12 at 4.)  Importantly, the Agreement did not address whether Split Vein was entitled to place for storage on Gilberton's property foreign culm that had been removed from other locations.

According to Section 8 of the Agreement:

> All bank material not removed and transported from the Premises at the expiration of this Agreement, or not removed at the time of any breach of this Agreement, shall be and remains the property of Gilberton.  Split Vein's failure to commence removal of the bank material, or a suspension or stoppage of removal on the Premises for a continuous period of four (4) months, shall nullify this Agreement, and thereupon, at any time thereafter, Gilberton may declare this Agreement terminated and void, and without leagl procedure, Gilberton shall retake possession of the Premises together with all improvements thereon.

(Id. at 5.)  It is noteworthy that Gilberton did not provide Split Vein notice of its intent to terminate the Agreement until after Split Vein filed its bankruptcy petition.  Pursuant to Section

---

[6] The parties modified this aspect of the Agreement orally after Split Vein began removing culm from the Excelsior Bank location.  Per this modification, Split Vein was to pay Gilberton "$3.00 per ton for 'fine' culm and $2.00 per ton for 'coarse' culm" in royalties.  (Doc. No. 2, Ex. 12 at 4.)

19 of the Agreement, in the event of a "breach or nonperformance" by Split Vein, the Agreement "shall be subject to cancellation at the option of Gilberton and then become absolutely void, and of no effect, and after ten (10) days written notice by Gilberton to Split Vein, it shall and may be lawful for Gilberton to re-enter and take possession of the Premises and appurtenances . . . ." (Id.)  In addition, should Split Vein fail to make the required royalty payments, Gilberton, at its option, could cancel the Agreement after providing Split Vein with ten days' notice of default. Pursuant to the Agreement, Split Vein agreed "to protect the Premises against forest or other fire" and, should a fire "occur anywhere on the Premises, Split Vein shall immediately notify Gilberton thereof and Split Vein shall prosecute such effective measures to extinguish the same or prevent its extension as Gilberton shall approve or direct . . . ."  (Doc. No. 2, Ex. 12 at 6.)

**B.      Split Vein's Operations on the Gilberton Property**

Prior to 1991, the Excelsior Bank property was totally surrounded by adjoining real estate and would have been inaccessible to Split Vein for the purposes of removing culm.  Split Vein purchased two plots of land that adjoined the Excelsior Bank property in November 1990 and May 1991 so that it would have access to the Excelsior Bank.  The Pennsylvania Department of Environmental Protection ("DEP") issued a surface mining permit ("SMP") on October 22, 1991, which allowed Split Vein to deposit culm at the Excelsior Bank site that had been removed from that site but that had been processed at Split Vein's breaker.

Although Split Vein did not keep records of the amount of culm redeposited at Excelsior Bank after processing at Split Vein's breaker, records do indicate that Split Vein paid royalties to Gilberton in an amount of $1,299,839.99 from July 1991 to July 1998.  Split Vein ceased its mining operations on the Excelsior Bank in 1998 and ceased making the minimum royalty

payments, although it had paid all royalties it owed to Gilberton for the culm it had removed. Because Split Vein calculated that the expenses associated with hauling the remaining Excelsior Bank and foreign culm would outweigh any price paid for the culm, Split Vein decided to leave the remaining culm on the site.  Swank informed a DEP inspector that the culm would be taken away from the Excelsior Bank site upon an improvement of the culm market.  Pursuant to the Agreement, Split Vein was required to comply with DEP regulations.  As such, Split Vein was required to conduct reclamation[7] activities on the land.  Split Vein began reclamation activities on the land in 2000.  Split Vein hired Ed Linkus to conduct its reclamation activities, which included spreading leaf compost over the mined areas.

### C.      Split Vein's Bankruptcy Petition

Split Vein initiated bankruptcy proceedings by filing a bankruptcy petition on May 19, 2003.  At that time, Split Vein did not list the culm currently at issue as an asset or the Agreement as a lease or an executory contract.  After it filed its complaint in the instant case, Split Vein amended these omissions in its bankruptcy petition on January 11, 2007.  On September 19, 2006, Split Vein received a letter from Gilberton in which Gilberton sought to provide Split Vein with notice that Gilberton was terminating the Agreement.

### D.      The Excelsior Bank Fire(s)

A fire was discovered on the Excelsior Bank property on or about July 11, 2005. Although evidence suggests that the fire was extinguished within a matter of days by Linkus, fire was again discovered in December 2005.  After being notified of the fire, Swank immediately

---

[7] As noted by Judge France, "[r]eclamation generally involves the leveling of the mined surface and the distribution of organic materials such as topsoil or leaf compost so that it will support new vegetation."  (Doc. No. 2, Ex. 12 at 7.)

surveyed the scene and decided that Split Vein's culm was being destroyed.  A number of fire departments, Split Vein, a Vince Guarna, and Linkus all fought the fire with no success. Although Reading Anthracite was notified of the fire by the DEP, Gilberton-affiliated companies did not take action in fighting the blaze.

On December 23, 2005, the DEP issued a compliance order on Split Vein after receiving a number of complaints from nearby residents concerning the fire.  Although the fire appeared to be extinguished on several occasions, it would reignite.  After the fire reignited in July 2006, Swank requested that his step-son, Victor Kocur, assist him in fighting the fire.  As compensation for fighting the fire, Kocur asked that he be granted permission to remove culm from the Excelsior Bank.  Swank agreed, and on July 3, 2006, the two signed a bill of sale, pursuant to which Swank agreed to sell to Kocur the "refuse material from Split Vein's breaker dumped at the Excelsior job."  (Doc. No. 2, Ex. 12 at 9.)  The price per ton was twenty-five cents.  However, this agreement was rescinded on July 30, 2006.

Kocur met with the DEP and a Gilberton official prior to tackling the job of bringing the Excelsior Bank fire under control.  A DEP report dated July 27, 2006, references Kocur's plan to remove and reprocess the culm located on the Excelsior Bank.  In addition, a DEP report dated August 16, 2006, notes that "there may be a market for the material and the whole bank may be removed, eliminating any fuel for future [fires]."  (Doc. No. 2, Ex. 12 at 10.)  Kocur met with a Gilberton official to gain its cooperation in bringing the blaze under control in August 2006, but the parties could not reach an agreement.

Pursuant to a letter dated July 13, 2006, Guarna and the Fox Coal Company ("Fox Coal") were granted permission by Gilberton "to excavate, remove and prepare breaker refuse material

from the Excelsior Refuse Bank."  (Id.)  Although Guarna sought the DEP's permission to "take over" Split Vein's SMP concerning the Excelsior Bank and to receive "all bonds associated with this project . . . at their cash value," the DEP conceded to neither request.  (Id.)  On November 22, 2006, Swank sent a letter to the DEP in which he claimed that Split Vein possessed the legal title of the foreign culm located on the Excelsior Bank.  Upon receipt of this letter, the DEP directed Gilberton to maintain records of the culm removed from the Excelsior Bank and that culm be removed only for purposes of fighting the fire on the Excelsior Bank.

> ### E.     The Removal of Culm from the Excelsior Bank During Gilberton's Fire-Fighting Activities

Pursuant to Gilberton's agreement with Fox Coal, Gilberton was to pay Fox Coal $1.00 for each ton of culm removed from Excelsior Bank, a fee that was eventually reduced by Gilberton.  On December 7, 2006, the DEP altered its position and entered an order requiring Gilberton to fight and extinguish the fire and releasing Split Vein from any obligation to continue its fire-fighting efforts.  Gilberton did not completely extinguish the fire until September 2008.

In total, Fox Coal removed over 507,116 tons of culm from both the Seedco and Gilberton properties.[8]  (Id. at 11.)  Gilberton sold this removed culm to three different cogeneration plants, amounting to gross revenues credited to Gilberton in an amount of $3,241,840.23.  (Id.)  Additional Gilberton-related entities were involved in the fire-fighting and removal of culm, including Barakat, which coordinated the independent truckers involved in the work; WMPI, which provided labor and equipment; Jack Rich, Inc., which supplied fuel; and

---

[8] During the course of the fire, the fire in fact spread onto property owned by Seedco.  The amount of culm removed from the Seedco property amounted to, according to a rough estimation by Guarna, "at least 100,000 tons."  (Doc. No. 2, Ex. 12 at 11.)

SSI, which was the purported culm titleholder.  The total cost associated with fighting the fire

was $2,630,802.60.  (Id. at 12.)

## V.      DISCUSSION

Five distinct issues concerning the Bankruptcy Court's decision of December 11, 2009,

are raised in the instant appeal.  First is whether the Bankruptcy Court properly concluded that

Split Vein met its burden in proving its conversion claim against Gilberton.  Second, Gilberton

appeals the part of the Bankruptcy Court's decision in which it concluded that Split Vein had not

abandoned the culm at issue.  The third issue presented on appeal is whether the Bankruptcy

Court was correct in concluding that Split Vein had not abandoned the Agreement.  The fourth

issue presented before this Court is whether the Bankruptcy Court correctly concluded that

Gilberton's argument concerning the operation of 11 U.S.C.A. § 365(d)(4) was waived.  The

final issue that this Court is required to address is whether the Bankruptcy Court was correct in

deciding that the doctrine of the "imminent public disaster" privilege was inapplicable.  The

Court will address each issue in turn.

### A.      The Conversion Claim

The first issue to be addressed on appeal is whether the Bankruptcy Court properly

concluded that Split Vein had met its burden in proving its conversion claim against Gilberton.

Under Pennsylvania law, "[a] conversion is the deprivation of another's right of property in, or

use or possession of, a chattel, or other interference therewith, without the owner's consent and

without lawful justification." Stevenson v. Econ. Bank of Ambridge, 197 A.2d 721, 726 (Pa.

1964).  In addition, in Pennsylvania, the "law is clear that the measure of damages for

conversion is the market value of the converted property at the time and place of conversion."

L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard Inc., 777 A.2d 1090, 1096 (Pa. Super. Ct. 2001) (Bank of Landisburg v. Burruss, 524 A.2d 896, 902 (Pa. Super. Ct. 1987).  Gilberton contends that the Bankruptcy Court erred in deciding that Split Vein had met its burden in proving that Gilberton had converted the culm.  As support, Gilberton points to the fact that Split Vein introduced no evidence at trial as to the amount of culm that it had dumped on the property. (Doc. No. 7 at 22.)  Gilberton also points to testimony that Split Vein did not keep records as to the amount of culm deposited on the property and that Split Vein failed to list such culm as assets at the time of its filing for bankruptcy.  (Id.)

In response, Split Vein concedes that it does not possess evidence establishing the amount of culm deposited from foreign sources on the Excelsior Bank.  However, Split Vein notes that testimony was introduced at trial evidencing that thousands of tons of foreign culm was deposited at the site from Split Vein's Paxinos Breaker from 2000 to 2003.  (Doc. No. 10 at 35.)  In addition, Split Vein argues that witness testimony, including that of Gilberton's witnesses, supports the conclusion that hundreds of thousands of tons of culm was dumped at the Excelsior Bank.  (Id. at 35 n.2.)  Finally, Split Vein posits that even if Excelsior Bank material were processed through the Paxinos Breaker and returned to the Excelsior Bank, this material would be owned by Split Vein pursuant to the Agreement.  (Id. at 36.)

The Court finds that Judge France correctly concluded that the culm removed by Fox Coal to fight the fire was placed on the property by Split Vein.  As Judge France noted, Split Vein called a number of witnesses to establish its ownership of the culm, and the evidence showed that much of the culm was deposited between 1998 and 2003.  The two witnesses called by Gilberton to rebut the testimony of Split Vein's witnesses – Gabe Nasser and Michael Rich –

were ineffective in doing so, as Nasser did not spend time on the property during that time and Rich was there only "occasionally."  In light of the above, the Court concludes that the Judge France correctly decided that the culm removed from the Excelsior Bank was placed there by Split Vein.

### B.    Abandonment of the Culm

In order to properly make out a claim for conversion against Gilberton, Split Vein must have maintained title to the culm prior to the filing of its bankruptcy petition.  As such, the second issue on appeal is whether the Bankruptcy Court was correct in concluding that Split Vein did not abandon the culm.  According to Pennsylvania law, "it is well-established that coal or coal by-products, when severed from the earth, become personal property which may be abandoned when left on the land of another with the intention of abandoning them."  In re G.M.P. Land Co., 33 B.R. 729, 731 (Bankr. E.D. Pa. 1983) (citing Llewellyn v. Philadelphia and Reading C. and I. Co., 308 Pa. 497 (1932); see also Fidelity-Philadelphia Trust Co. v. Lehigh Valley Coal Co., 294 Pa. 47 (1928)).  "Abandonment includes both the intention and the external act by which the intention is carried into effect; intention may and indeed often must be inferred from acts. Ordinarily abandonment is a question of fact to be determined by the jury, under all the circumstances of the case."  Llewellyn, 308 Pa. at 501-502.[9]

In Pennsylvania, there exists a presumption against abandonment of personal property. See Lehigh Valley Coal, 294 Pa. at 65.  However, "if the thing claimed to be abandoned is

_____

[9] As noted by the United States Court of Appeals for the Third Circuit, "[a]bandonment is not a question of narrative or historical fact but an ultimate fact, a legal concept with a factual component." Universal Minerals, Inc. v. C. A. Hughes & Co., 669 F.2d 98, 103 (3d Cir. 1981).  As such, "[i]t is 'a conclusion of law or at least a determination of a mixed question of law and fact' that requires "'the application of a legal standard to the historical-fact determinations."  Id. (quoting Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 491 (1937); Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963)).

considered <u>valueless and a hindrance</u> in his own opinion and is so considered by the general opinion of the community, the presumption that he intends to preserve such property cannot arise." <u>Id.</u> (emphasis added).  In <u>G.M.P. Land Co.</u>, 33 B.R. at 732, the United States Bankruptcy Court for the Eastern District of Pennsylvania stated that "[a]ccording to Lehigh Valley, once it is established that material deposited upon the property of another was <u>of no use and no commercial value</u> during the time it was being deposited, it is incumbent upon the party opposing a determination of abandonment to prove affirmatively that the person or entity that allegedly abandoned the material actually intended to retain ownership of the material, in light of all of the circumstances of the case." (emphasis added).

These two apparently contradictory prerequisites to imposition of the presumption against abandonment are at the heart of the parties' arguments concerning abandonment in general.  Split Vein argues that the Bankruptcy Court correctly determined that "commercial value" is not the proper test in determining whether the presumption against abandonment should apply, as this term was not used by the Pennsylvania Supreme Court in <u>Lehigh Valley Coal</u>.  (<u>See</u> Doc. No. 10; Doc. No. 2, Ex. 12 at 21, n.18.)  Split Vein therefore contends that the Bankruptcy Court properly concluded that the culm was not "valueless" at the time Split Vein deposited the culm on the property and that sufficient evidence was offered by Split Vein showing that it did not intend to abandon the culm.  (Doc. No. 10 at 39-40.)

Gilberton contends that Split Vein has mischaracterized the Pennsylvania Supreme Court's holding in <u>Lehigh Valley Coal</u>.  Gilberton argues that "[a]though the Supreme Court used the terms 'valueless' and a 'hindrance' it certainly did not mean that the culm in question was of absolutely no value whatsoever."  (Doc. No. 7 at 25.)  Gilberton points to several factors

in <u>Lehigh Valley Coal</u> and argues that these factors show that the culm in that case "was of some value." (<u>Id.</u>) Similarly, Gilberton contends that the culm in the instant case was of some value, as was testified to by Swank. (<u>Id.</u>, Bankruptcy Ct. Tr., February 11, 2009, at 33-34.) However, it is Gilberton's position that, though the culm in this case may have had some value, it "had no viable commercial value at the time [it was] dumped by Split Vein." (Doc. No. 7 at 26.) Gilberton claims that it need not show the total absence of value or, in other words, show that the culm was "valueless" and a "hindrance." (<u>Id.</u> at 27.) Instead, Gilberton contends that it need only "show that the materials had no value to Mr. Swank at the time of abandonment." (<u>Id.</u>) Gilberton argues that this standard is met by the fact that, <u>inter alia</u>, Swank admitted that the price he could receive for removing the culm was exceed by the cost to transport the material. (<u>Id.</u>)

Clearly, the threshold issue is the standard to be used to determine the applicability of the presumption: whether the culm was of no "commercial value" or whether the culm was "valueless and a hindrance." The Pennsylvania Supreme Court used the term "valueless and a hindrance" in its <u>Lehigh Valley Coal</u> decision. 294 Pa. at 480. If the Pennsylvania Supreme Court had chosen to, it could have used the term "commercial value" or a similar term to indicate that a finding of valuelessness was not required for the presumption to be extinguished. The Pennsylvania Supreme Court chose to do no such thing, and this Court will not read the Pennsylvania Supreme Court to have chosen such a path despite the protestations and attempts from Gilberton to show that the Pennsylvania Supreme Court meant otherwise. Therefore, the Court agrees with the Bankruptcy Court in its conclusion that, "because the culm did have value when it was deposited, [Split Vein] is entitled to the presumption that it did not abandon the

14

materials deposited on Excelsior."  (Doc. No. 21-22.)

Simple non-use "does not constitute abandonment."  <u>United Natural Gas Co. v. James Bros. Lumber Co.</u>, 325 Pa. 469, 473 (1937) (citing <u>Llewellyn</u>, 308 Pa. at 501-502).  Instead, "there must be an intention to abandon, together with 'external' acts by which such intention is carried into effect."  <u>Id.</u>  As the Bankruptcy Court noted in its December 11, 2009 opinion, several facts support abandonment: (1) Split Vein's failure to report the culm at issue on its schedules filed in bankruptcy; (2) testimony by Swank as to how this failure occurred; (3) Split Vein's failure to maintain records concerning the culm; (4) Swank's use of the culm to fill in stripping pits; and (5) Split Vein's reclamation activities on the site just prior to the fire.  (Doc. No. 2, Ex. 12 at 22-23.)  However, the Bankruptcy Court pointed to other factors which supported the conclusion that Split Vein did not abandon the culm.  The Court concludes that these factors are conclusive.  First, Gilberton failed to terminate the lease despite years of Split Vein's failure to pay any royalties and, as such, Split Vein remained the lessee under the Agreement entered into between the parties.  (<u>Id.</u> at 23.)  Also, at the time of the filing of the bankruptcy petition, Split Vein had undertaken reclamation processes and, after the filing of the petition, fought the fire that ignited in the area of these reclamation activities.  (<u>Id.</u>)[10]  Evidence also shows that, throughout the litigation in this case, Split Vein has maintained signage on the property and Swank had even tried to transfer Split Vein's interest in the culm to Swank's step-son.  (<u>Id.</u> at 23-24.)

In light of the above, the Court agrees with the Bankruptcy Court's conclusion that Split

---

[10] As the Bankruptcy Court noted, the reclamation bonds posted by Split Vein against the Excelsior Bank property "were still in place at the time of the fire."  (<u>Id.</u>)

Vein did not abandon the culm.  Therefore, the Court will affirm the Bankruptcy Court's

decision on the issue of abandonment of the culm.

### C.      Abandonment of the Agreement

The third issue on appeal is whether the Bankruptcy Court was correct in concluding that

Split Vein had not abandoned the Agreement.  Gilberton argues that, "[i]f any possessory interest

in the premises existed, it was abandoned when Split Vein ceased mining activities in 1998."

(Doc. No. 7.)  The Court agrees with Split Vein that the Bankruptcy Court thoroughly and

properly addressed this issue in its opinion.  (Doc. No. 2, Ex. 12 at 23-24.)  Many of the same

factors that militate against a finding of abandonment of the culm are similarly applicable to the

issue of abandonment of the Agreement.  See supra, Part V.B.2.  In addition to these factors, the

Bankruptcy Court noted that the Agreement specifically provided that termination of the lease

required a declaration by Gilberton that the Agreement was void and that such a declaration did

not occur until September 19, 2006.  (Doc. No. 2, Ex. 12 at 8, 16.)[11]  Accordingly, the Court will

affirm the Bankruptcy Court's finding that Split Vein had not abandoned the Agreement.

### D.      11 U.S.C. § 365(d)(4)

The fourth issue presented before the Court is whether the Bankruptcy Court correctly

concluded that Gilberton had waived its argument concerning the operation of 11 U.S.C.A. §

365(d)(4).  Gilberton argues that the Bankruptcy Court should have concluded that the

Agreement was terminated, by law, pursuant to 11 U.S.C. § 365(d)(4).  At the time of the filing

of the bankruptcy petition, § 365(d)(4) stated the following:

---

[11] As Split Vein correctly points out, in light of this provision, the written Agreement could not be
abandoned or terminated by Split Vein.  (Doc. No. 10 at 43.)

> (4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4) (2004).  As the filing of a bankruptcy petition constitutes such an "order for relief," see 11 U.S.C.A. § 301, and Split Vein neither assumed nor rejected the lease under the allotted time under § 365(d)(4), Gilberton contends that Split's Vein's failure constitutes a rejection.  (Doc. No. 7 at 31.)

The issue of termination of the lease pursuant to § 365(d)(4) was first raised in Gilberton's motion for reconsideration of the Bankruptcy Court's December 11, 2009 opinion. (Doc. No. 2-11; Doc. No. 2-9 at 3-4.)  In its opinion denying Gilberton's motion for reconsideration, the Bankruptcy Court noted that Gilberton had not previously raised the § 365(d)(4) issue before the court, and "that 'reconsideration motions may not be used to raise new arguments or present evidence that could have been raised prior to the entry of the judgment.'" (Doc. No. 2, Ex. 14 at 8) (quoting Zied v. Astrue, Doc. No. 3:06-cv-2305, 2010 WL 2804879, at *2 (M.D. Pa. July 15, 2010)).  As such, the Bankruptcy Court concluded that "Gilberton's argument under § 365(d)(4) does not compel reconsideration of the December 11 Opinion." (Doc. No. 2, Ex. 14 at 8.)

The Court agrees with the Bankruptcy Court's August 11, 2010 opinion in which it denied Gilberton's argument under § 365(d)(4).  Although Gilberton states that it did not realize that the Agreement would be construed as a lease until the Bankruptcy Court issued its December 11, 2009 Order, the Court finds this argument to be without merit.  (Doc. No. 7 at 33-

34.)  As the Bankruptcy Court noted, Gilberton could have raised its § 365(d)(4) argument "as early as the summary judgment stage" but failed to do so.  Therefore, the Court is constrained to agree with the Bankruptcy Court and conclude that Gilberton has waived its argument under § 365(d)(4).

### E.    Applicability of the Imminent Disaster Privilege

The fifth and final issue raised before the Court is whether the Bankruptcy Court was correct in deciding the inapplicability of the "imminent public disaster" privilege.  According to the Pennsylvania Supreme Court, "the law will excuse a trespass onto the land of another, 'if it is, or if the actor reasonably believes it to be necessary for the purpose of averting an imminent public disaster.'"  Commonwealth v. Berrigan, 509 Pa. 118, 123 (1985) (quoting Restatement of Torts (Second), § 196).  In addition, "trespass to the chattel of another or its conversion is excusable 'if the act is or is reasonably believed to be necessary for the purpose of avoiding a public disaster.'"  Id. (quoting Restatement of Torts (Second), § 262).[12]

Gilberton cites no case law in support of its belief that it should be entitled to both the

---

[12] As the Supreme Court stated in Commonwealth v. Berrigan, the defense of justification will lie only where the actor offers evidence that will demonstrate:

> 1) that the actor was faced with a public disaster that was clear and imminent, not debatable or speculative;
>
> 2) that the actor could reasonably expect that the actions taken would be effective in avoiding the immediate public disaster;
>
> 3) that there is no legal alternative which will be effective in abating the immediate public disaster;
>
> 4) that no legislative purpose exists to exclude the justification from the particular situation faced by the actor.

509 Pa. at 124.

costs and profits of its removal of the culm, as well as its conclusion that "the fire undoubtedly presented the risk of an imminent public disaster." (Doc. No. 7 at 34.)  First, as the Bankruptcy Court aptly noted, "under the terms of the Agreement Gilberton was entitled to recover its costs, but it was not privileged to earn a profit by selling [Split Vein's] property."  (Doc. No. 2, Ex. 12 at 25.)  Second, the Court remains unpersuaded that the bank fire was an "imminent public disaster."  The Court fails to see how disaster was "imminent" when, inter alia, Split Vein was allowed eighteen months to fight the fire, with little success, and the DEP granted Gilberton a number of extensions to fight the fire, eventually taking nearly two years to finally control the blaze.  Because imminence was clearly lacking in this case, the Court agrees with the Bankruptcy Court's conclusion that any privilege based upon an "imminent public disaster" is inapplicable.

## VI.  CONCLUSION

For the reasons set forth above, the Court will affirm the December 11, 2009 order of the Bankruptcy Court.  An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| **GILBERTON COAL COMPANY,** | : | |
|      **Appellant** | : | **CIVIL NO. 4:10-CV-01947** |
| | : | |
|   **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **SPLIT VEIN COAL COMPANY,** | : | |
|      **Appellee/** | : | |
|      **Debtor in Possession** | : | |

## ORDER

**NOW**, this 29th day of April 2011, for the reasons set forth in the accompanying

memorandum, **IT IS HEREBY ORDERED THAT:**

    1.     The December 11, 2009 Order of the United States Bankruptcy Court for the
Middle District of Pennsylvania is **AFFIRMED**.

    2.     The Clerk of Court is directed to close the case.


                                               s/ Yvette Kane
                                          Yvette Kane, Chief Judge
                                          U.S. District Court
                                          Middle District of Pennsylvania